IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 6, 2005

## STATE OF TENNESSEE v. STEVEN MURPHY

**Direct Appeal from the Criminal Court for Shelby County**
**Nos.  01-02750-51     Joseph B. Dailey, Judge**

_____

**No. W2004-02899-CCA-R3-CD  - Filed February 22, 2006**

_____

The defendant, Steven Murphy, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder, first degree felony murder, and two counts of theft of property over $1000, a Class D felony.  The trial court merged the first degree felony murder conviction into the premeditated murder conviction, for which the defendant was sentenced to life without the possibility of parole, merged the two theft convictions, and sentenced the defendant to two years for the theft conviction, to be served concurrently with the life sentence without parole.  On appeal, the defendant contends that the trial court erred in denying his motion in limine to allow hearsay statements of the victim into evidence, in denying his motion to suppress his statements to police, and in not instructing the jury on the adverse inference that could be drawn from the State's failure to preserve the tape recording of the defendant's statements.  Having reviewed the record and found no error, we affirm the judgments of the trial court but remand for entry of a corrected judgment in Case No. 01-02751 to reflect the defendant's conviction offense which was omitted.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

William Gosnell (at trial) and Brett B. Stein (at trial and on appeal), Memphis, Tennessee, for the appellant, Steven Murphy.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jerry Harris and Stephen P. Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

This case arises out of the stabbing death of the victim, Rhonda Pope, in her Memphis apartment. On Friday, April 7, 2000, the victim's brother discovered the victim lying dead on her bedroom floor. Although the bedroom had been ransacked and several items were missing, the doors to the apartment were locked and there were no signs of forced entry. The defendant, who had been renting a room from the victim, was not at the apartment when the police began their investigation. However, at approximately 11:30 a.m. the next day, he voluntarily came to the police department, where he eventually provided three separate oral accounts of the incident, was arrested, and gave an initial written statement suggesting that a drug dealer to whom he owed money was the perpetrator of the crimes.

As the investigation continued over the weekend, police officers learned that the defendant had been seen carrying a television set from the victim's apartment to the victim's car in the early morning hours of Thursday, April 6; that later that morning he had tried to sell the victim's car without a title; and that he had pawned several of the victim's missing items. They also learned that the defendant had failed to show up for his shift as a restaurant cook on Thursday night and had subsequently telephoned his employer to inform him that something had come up and he would no longer be able to work at the restaurant. The defendant was formally charged with the victim's murder at 2:39 p.m. on April 10. Approximately four hours later, he gave a second statement in which he admitted that he had killed the victim.

Prior to trial, the defendant filed a motion to suppress his statements to police on the basis that they were the product of an unlawful detention without a prompt probable cause hearing and he lacked the mental capacity to make a knowing and valid waiver of his right to remain silent or to have counsel present during questioning. At an April 13, 2003, hearing on the defendant's motion to suppress, Sergeant James L. Fitzpatrick of the Memphis Police Department testified as follows. He had been a police officer for twenty-nine years, was assigned to the homicide bureau, and participated in the investigation of the victim's murder. From his initial investigation on April 7, he learned that the victim's bedroom had been ransacked; that two televisions, a computer, and computer equipment were missing from the apartment; that the victim's vehicle was not parked in its customary space but was found later that afternoon at a different, nearby apartment complex; and that the last time the victim had been seen alive was Wednesday evening when she picked the defendant up from his workplace.

Sergeant Fitzpatrick's first contact with the defendant occurred at approximately 11:30 a.m. on Saturday, April 8, when the defendant voluntarily came into the homicide office with his girlfriend, Christina McKnight. Sergeant Earnestine Davison, the case coordinator, asked that he and Sergeant Ryall interview the defendant while she and another investigator interviewed Ms. McKnight. Therefore, he and Sergeant Ryall went into one of the interview rooms with the defendant, where Sergeant Ryall began by reading the defendant his rights. Although the defendant

told them he understood his rights, he refused to sign the waiver until his girlfriend read the rights to him as well. Since he had already informed the officers that he could not read very well, they agreed to his request and brought Ms. McKnight into the interview room. After Ms. McKnight had read the defendant his rights, she and Sergeant Ryall signed as witnesses and the defendant signed the waiver at 12:11 p.m. on April 8, 2000.

The defendant was not in custody when the interview began but was placed under arrest at 2:00 or 2:30 p.m. as inconsistencies in his story began to develop. The defendant first told the officers that the victim had picked him up on Wednesday evening at his place of employment, that he and the victim had separated to run errands, and that he had discovered the victim's body when he returned to the apartment a short time later. While being escorted to the bathroom, however, the defendant made a "spontaneous utterance" that a "dope boy" named "Clyde," to whom the defendant had owed money and who had been in front of the victim's apartment when the defendant left by the back door, was responsible for the victim's murder. As the interview continued, the defendant eventually provided three separate oral accounts of the incident.

Sergeant Fitzpatrick testified that he and Sergeant Davison, who had replaced Sergeant Ryall in the interview room, began taking the defendant's first written statement at 3:45 p.m. Before they began, they informed the defendant that he was under arrest and could be charged with the victim's murder. They also read him his rights, contained in the computer-generated form at the beginning of the statement, and the defendant initialed the form, indicating that he understood those rights and wished to make a statement at that time. The defendant's statement was typed by a secretary and read aloud to the defendant, who signed it at 7:45 p.m. The defendant was responsive to their questions and did not appear to be under the influence of any intoxicant or to be suffering from any mental or emotional disability.

Sergeant Fitzpatrick further testified as follows. The next day, Sunday, April 9, the defendant was taken from jail to an apartment complex near the victim's apartment so that he could point out where the alleged drug dealer, "Clyde," lived. While that was taking place, Sergeant Fitzpatrick and Sergeant Davison arranged for Kristy Boddie, the victim's neighbor, to come to the jail to see if she could identify the defendant as the man she had seen carrying a televison set to the victim's car in the early morning hours of Thursday, April 6. They subsequently conducted a lineup and Boddie identified the defendant. Later that afternoon, the man the defendant had identified as the drug dealer "Clyde," but whose real name was Carlos Shaw, came into the homicide office and described how the defendant had tried to sell him the victim's vehicle without a title. Sergeant Fitzpatrick said that Shaw immediately and positively identified the defendant from a photographic spreadsheet as the man who had tried to sell him the vehicle.

Sergeant Fitzpatrick acknowledged they had enough evidence to charge the defendant with the victim's murder on Sunday afternoon, April 9. He explained, however, that the police department had an agreement with the district attorney's office that they would not charge anyone with first or second degree murder until they had discussed the case with an attorney from that office. Accordingly, he and Sergeant Davison discussed the case with the assistant district attorney general

between 8:30 and 9:00 a.m. Monday morning, and the assistant district attorney general signed the form authorizing them to charge the defendant. He said the defendant was formally charged with the first degree murder of the victim at approximately 2:40 p.m.

Sergeant Fitzpatrick testified that the defendant had, in the meantime, been brought back to their offices shortly before noon on Monday and that he and Detective Johnson had been interviewing him since approximately 1:00 p.m. He said that later that afternoon the defendant revealed to Sergeant Davison, who had replaced Detective Johnson in the interview room, that he had concealed the murder weapon in a sock and thrown it behind the washer or dryer in the victim's apartment. Sergeant Fitzpatrick stated that they took a break in the interview process while Sergeant Davison dispatched investigators to the victim's apartment to retrieve the knife. He testified they began taking the defendant's second written statement at 6:25 p.m. Before they began, they informed the defendant that he was under arrest and had been charged with the first degree murder of the victim in the perpetration of a theft. They also informed him of his rights, and the defendant once again indicated he understood his rights and wished to make a statement. The defendant was again responsive to their questions and did not appear to be under the influence of drugs or alcohol or suffering from any mental or emotional problems. When the statement was completed, Sergeant Thompson read it aloud to the defendant and the defendant and Sergeant Thompson both signed it. On cross-examination, Sergeant Fitzpatrick acknowledged that he knew at the time the defendant first came into the homicide office that he had been involved in a homicide in Illinois approximately ten years earlier. He insisted, however, that the defendant was not under arrest when the interview began.

Sergeant Earnestine Davison testified she had been employed by the Memphis Police Department for twenty-one years and had been working in homicide for five years. She confirmed that the defendant voluntarily came into the homicide office with his girlfriend on April 8 and was not under arrest when the interview process began. She said she became involved in the defendant's interview later that afternoon and participated in both of the written statements. She testified that the defendant was advised of his rights prior to each statement and that each statement was read aloud to the defendant before he signed it. In each case, the defendant indicated that he understood his rights and wished to make a statement. He did not appear to be under the influence of drugs or alcohol or to be suffering from any mental or emotional problems.

Sergeant Davison also confirmed that the police department's normal protocol, per agreement with the district attorney's office, was for the district attorney's office to review and approve of any first or second degree murder charges brought against a suspect. She testified that the district attorney's office authorized the charges against the defendant at approximately 9:00 a.m. on Monday, April 10, 2000, and that the affidavit of complaint and arrest warrant were then taken before a magistrate and executed at 2:39 p.m. On cross-examination, Sergeant Davison acknowledged that she had been informed by individuals who knew the defendant that he was a drug addict but that she did not ask him whether he was under the influence of any drugs or alcohol at the time of the interviews. She further acknowledged that the arrest ticket used to book the defendant into jail on Saturday evening stated only that there was "probable cause for arrest," which meant the defendant

had been held Saturday night, all day Sunday, and Monday morning and early afternoon without being formally charged.

At the conclusion of the April 13, 2003, hearing, the trial court denied the defendant's motion to suppress the statements on the basis of the alleged Fourth Amendment violation, finding, among other things, that there was no evidence that the police officers purposefully detained the defendant in order to extract his confession. Thereafter, the hearing on the defendant's motion continued on July 23, 2004, with the presentation of evidence relating to his claim of mental incapacity. The defendant presented three expert witnesses in support of that claim: a clinical psychologist, a neuropsychologist, and a psychiatrist. Dr. Joseph Charles Angelillo, the clinical psychologist, testified that he was appointed to examine the defendant in the spring of 2002. He said, during their first meeting, the defendant reported that he had been hospitalized a number of years ago for a "significant head injury," that he had suffered from a depressed mood and been treated for psychosis, and that he had abused street drugs and alcohol. During that visit, he also learned that the defendant was currently taking Prolixin, an antipsychotic medication, and Cogentin, a drug used to treat the side effects of Prolixin.

Dr. Angelillo testified that during his second visit, he administered the Wechsler Abbreviated Scale of Intelligence, or "WASI," test to the defendant, which was not valid for "purposes in the courtroom" but was valid for his purpose of determining whether he needed to follow up by administering a longer, more reliable test. On the abbreviated test, the defendant's verbal IQ was 62 and his performance IQ was 74, for a full scale IQ of 66. One week later, he administered the "Wechsler Memory Scale" test, which measures "one's ability to process information." According to Dr. Angelillo, the defendant performed better on the memory scale than he did on the abbreviated IQ test, with scores of 80 and 78, respectively, on the "immediate auditory memory" and "visual immediate memory" portions of the test.

Dr. Angelillo testified he saw the defendant for a final time approximately one year later, in April 2003, when he administered the "Wechsler Adult Intelligence Scale . . . Third Edition," or "WAIS III," the "test . . . accepted by most psychologists as at least one of the gold standards." On that test, the defendant's verbal IQ was 71, his performance IQ was 70, and his full-scale IQ was 68. When questioned by the trial court about how the full-scale IQ score could be lower than either the verbal or the performance IQ scores, Dr. Angelillo explained that it was because the WAIS III was "normed differently" than the "WAIS R," in which the full-scale IQ is the mathematical average of the verbal and performance IQ scores. Dr. Angelillo stated that he did not "evaluate [the defendant] as far as retardation" but that "[a] score of below 70 would qualify or describe one as mildly retarded if there were other . . . measures of adaptive functioning which also point in that direction." Based on his examination, Dr. Angelillo believed that while the defendant might be able to understand the Miranda warning if it was broken up into sections, he would have difficulty in understanding it read as a whole. On cross-examination, Dr. Angelillo testified he was aware that the defendant had a substantial prior criminal record but could not say whether the defendant had any previous experience with the Miranda warnings.

Dr. Dale Foster, the neuropsychologist, testified that he accepted an appointment to examine the defendant in February 2004 and eventually met with him on February 25, April 13, and April 28, 2004. During those visits, he administered a battery of psychological tests, including the Wechsler Adult Intelligence Scale, an IQ test; the "Categories" test, a "test of abstract reasoning, concept formation, and judgment"; the Minnesota Multiphasic Personality Inventory II, or "MMPI," which was "a personality inventory that looks for unconventional thinking" and "the tendency to . . . malinger"; and the "Validity Indicator Profile." He said that the defendant's IQ scores fell in the "low average" range, with a verbal score of 81, a performance score of 83, and a full-scale IQ of 81. However, the defendant missed over sixty percent of the items on the "Categories" test, which placed him in the range of performance that one would expect from a child of ten or twelve.

Dr. Foster testified that the defendant "responded in a very extreme way" on the MMPI, suggesting the possibility that he was "faking bad" or malingering. He, therefore, administered "The Validity Indicator Profile," a nonverbal validity indicator, the results of which suggested that the defendant was not malingering but instead was "making [a] good effort." Dr. Foster stated that he concluded the defendant had an overall generalized impairment with severe impairment in the areas of abstract reasoning, concept formation, attention, and concentration. He testified that based on the "Halstead-Reitan Battery," which compared the defendant's test results with those of people with and without organic brain damage, the defendant fit best in the group of individuals who had organic brain damage with moderate impairment. Dr. Foster testified that the defendant informed him that he was taking Prolixin, Depakote, and Trazodone. He explained that those drugs were an antipsychotic, an anticonvulsant, and an antidepressant and that they "would help with the problems related to the brain – mental problems." On cross-examination, he acknowledged that the defendant's "F-Scale" on the MMPI was 120 and that an "F greater than 89 is usually interpreted to indicate an invalid profile."

Dr. Joel Allen Reeceman, the psychiatrist, testified that he reviewed Dr. Foster's and Dr. Angelillo's reports, conducted his own evaluation of the defendant, and concurred in Dr. Foster's conclusion that the defendant had organic brain dysfunction. He said that the defendant "had a long-term diagnosis of organic mental disorder and previously had been found incompetent to stand trial for that reason." He stated that when he saw him in December 2002 and January 2003, the defendant was taking Prolixin, an antipsychotic medication, Senequan, an antidepressant, and Depakote, an antiseizure medication. Dr. Reeceman testified that the defendant was very simple and concrete in his thinking, and he opined that for that reason the defendant would be unable to understand the rights contained in the <u>Miranda</u> warning. On cross-examination, he acknowledged that before evaluating the defendant, he had him sign a written waiver on December 30, 2002, acknowledging that his evaluation did not create a doctor-patient relationship between them. He further acknowledged that on January 15, 2003, he had found that the defendant was competent to stand trial.

The State presented one witness on the issue of the defendant's mental competency: Donald Newsom, the defendant's former employer. Newsom testified that at the time of the victim's murder the defendant worked as a short-order cook at his catfish restaurant. As part of his duties, the

defendant received, read, and filled from 50 to 100 orders during a typical day. Newsom testified that the defendant was able to work independently and expeditiously and performed as well as the other cook employed at the restaurant. He said that, in addition to working for him, the defendant was also a member of his church and had once been a houseguest in his home for a week. He testified that the defendant received a letter from the Social Security Administration about his disability benefits during the period he stayed in his home and that he appeared able to read the letter and understand its contents. Newsom further testified that the defendant asked that his wages be paid in cash so that his job would not interfere with his disability benefits.

At the conclusion of the July 23, 2004, hearing, the trial court overruled the defendant's motion to suppress his statements on the basis of the alleged Fifth Amendment violation as well, finding that the evidence did not support the defendant's contention that he lacked the mental capacity to understand the Miranda warnings. The defendant was subsequently tried before a criminal court jury, found guilty of first degree murder and theft over $1000, and sentenced to life imprisonment without the possibility of parole.

## ANALYSIS

### I. Denial of Motion in Limine

As his first issue, the defendant contends that the trial court erred in denying his motion in limine to present hearsay testimony by two friends of the victim. Specifically, the defendant sought to present testimony from Leonardis Cunningham that the victim had told him that her ex-boyfriend, James Polk, had threatened to cut her throat, that she was afraid of Polk, and that she was going to get a restraining order against him, and testimony from Larnitwa Wallace that the victim had similarly told her that she intended to get a restraining order against Polk because she had experienced a problem with him in the past. The defendant argues that such evidence was critical to his defense that he did not commit the crime and that the proposed witnesses, both of whom were friends of the victim, "had all the indicia of reliability." The State argues that the trial court properly excluded the evidence as inadmissible hearsay. We agree with the State.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn.), cert. denied, 534 U.S. 998, 122 S. Ct. 471, 151 L. Ed. 2d 386 (2001). As such, we will not reverse the trial court's rulings on this issue absent a showing that it abused its discretion. Id.

The proposed testimony involved classic hearsay, clearly intended to prove the truth of the matter asserted; namely, that James Polk had killed the victim. Moreover, as the trial court noted, the testimony the defendant sought to present by Cunningham, that the victim had told him that Polk

had threatened to kill her, was double hearsay, neither layer of which fell within any of the recognized exceptions to the rule against hearsay. Although the defendant argues that the witnesses' status as friends of the victim vested them with "all the indicia of reliability," he cites no authority for that proposition. Accordingly, we conclude that the trial court properly excluded the testimony.

## II. Denial of Motion to Suppress Statements

The defendant next contends that the trial court erred in denying his motion to suppress his statements to police. The defendant argues, as he did before the trial court, that the statements were the product of an unlawful detention without a prompt probable cause hearing and that he lacked the mental capacity to make a free and voluntary waiver of his Miranda rights. When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, the findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The defendant first cites State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996), to argue that his statements should be suppressed as the product of his unlawful detention. He asserts that the evidence at the suppression hearing shows that the investigators deliberately held him in jail "pending investigation" for the sole purpose of extracting his confession. The State argues, *inter alia*, that Huddleston is easily distinguishable on its facts and that the evidence in this case supports the trial court's finding that no Fourth Amendment violation occurred. We agree with the State.

The defendant in Huddleston was arrested without a warrant on a Friday afternoon and held without a judicial determination of probable cause before issuing a confession, preceded by Miranda warnings and a signed waiver of rights, on the following Monday afternoon. 924 S.W.2d at 668. The next day, relying solely on the defendant's confession, a police detective obtained a probable cause warrant from a magistrate. Id. The State conceded that the more than seventy-two-hour detention preceding the judicial probable cause determination constituted an unreasonable delay and hence a Fourth Amendment violation, but argued that suppression of the confession was not the proper remedy for the constitutional violation. Id. at 672. In its determination of that issue, our supreme court adopted the "fruit of the poisonous tree" analysis, in which the "focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality." Id. at 674. The Huddleston court noted that a judicial determination of probable cause that occurs within forty-eight hours of a defendant's arrest is generally sufficient to satisfy the Fourth Amendment, unless there is evidence that the probable cause determination was unreasonably delayed for the purpose of gathering additional information to justify an arrest, was motivated by ill will toward the defendant,

or constituted a "'delay for delay's sake.'" Id. at 672 (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49, 63 (1991)).

In denying the defendant's motion to suppress his statements on the basis of the alleged Fourth Amendment violation, the trial court found that the defendant voluntarily came into the police department on Saturday, April 8, and was not in custody when the interview began, that the officers had ample probable cause to hold him pending further investigation, and that the officers' intent in detaining the defendant over the weekend was not to extract the Monday, April 10, statement, as evidenced by the fact that the statement was not obtained until approximately four hours after the affidavit of complaint and arrest warrant had been executed.

The evidence at the suppression hearing preponderates in favor of the trial court's findings. The record reveals that the defendant was detained pending investigation for approximately forty-eight hours, from the time he was arrested at 2:00 or 2:30 p.m. on Saturday, April 8, until the affidavit of complaint and arrest warrant were taken before a magistrate and executed at 2:39 p.m. on Monday, April 10. However, as the trial court noted, the defendant's second statement, in which he admitted he was responsible for the victim's murder, was not obtained until approximately four hours after the defendant had been formally charged with the victim's murder. Thus, the investigators had already gathered sufficient evidence to charge the defendant with the victim's murder prior to obtaining his confession. Moreover, both Sergeant Fitzpatrick and Sergeant Davison explained that the delay in bringing formal charges against the defendant resulted from their department's agreement to allow the district attorney's office to review and approve all first and second degree murder charges. In sum, there is nothing in the record to suggest that the officers lacked probable cause to arrest the defendant or detained him without probable cause for the sole purpose of extracting his confession. We conclude, therefore, that no Fourth Amendment violation occurred in this case.

The defendant additionally argues that he lacked the mental capacity to make a voluntary waiver of his Fifth Amendment rights. In support, he cites the testimony of the expert witnesses that he has low IQ scores, has organic brain dysfunction with moderate impairment, and is very simple and concrete in his thinking. The State argues, *inter alia*, that the evidence at the April 13, 2003, hearing supports the trial court's finding that the defendant had the capacity to make a knowing and intelligent waiver of his right to remain silent or to have counsel present during questioning. Once again, we agree with the State.

In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884, 68 L. Ed. 2d 378 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct.

1019, 1023, 82 L. Ed. 1461 (1938)).  The waiver must be "'made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994)).  The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

In denying the defendant's motion to suppress on the basis of his claim of mental incompetence, the trial court noted, *inter alia*:  the defendant had scored in the low average range on one of the IQ tests administered; the MMPI suggested that the defendant was malingering or "faking bad" in an effort to make himself appear worse than he really was; the drugs the defendant had been prescribed should have aided, rather than hindered, his understanding; and the defendant, according to his former employer, had no difficulty performing the duties of a short-order cook and appeared able to read and understand a letter from the Social Security Administration.  The trial court also noted that the defendant had extensive prior experience with the criminal justice system, as evidenced by his criminal record.  Finally, the trial court observed that Dr. Reeceman, who had opined that the defendant would be unable to understand the Miranda rights because of the simple and concrete nature of his thinking, had nonetheless required the defendant to sign a two-page, written waiver acknowledging that his evaluation did not create a doctor-patient relationship.  The trial court stated in pertinent part:

> And then, of course, the irony of all ironies is when you get to the fact that Dr. Reeceman had your client sign a waiver acknowledging the relationship between Dr. Reeceman and your client; that it wasn't a doctor/patient relationship; that there was no confidentiality in their discussions; that he understood why he was there and this and that – a two-page waiver that he read to him and had your client sign and obviously was comfortable enough with the fact that your client understood that waiver – he had him sign it and he stuck it in his file for his own protection. And I have a tremendous respect for Dr. Reeceman as a doctor and as a person, but it's just so ironic that the same doctor that's in here saying, "Well, I really don't think he could have understood the Miranda rights that were read to him for about the fortieth time in his life; but oh, yeah, he understood that waiver I gave him – that two-page waiver about confidentiality and doctor/patient relationship – oh, yeah, he understood that fine. . . .

> So I think that your client – I think the proof – and all that I've discussed today is just today's proof. If you factor in the testimony from Ms. Davison and Mr. Fitzpatrick from the police department and their observations about your client's demeanor and his understanding of what went on and the logical answers he gave to the questions with self-serving answers, and then the responses and all of that, it would certainly suggest to me that he knew full well what his rights were, voluntarily waived them, proceeded to make these two statements.  I'll deny the motion to suppress.

The evidence fully supports the findings and conclusions of the trial court. The defendant's full scale IQ scores ranged from 81 on the WAIS-R scale, which Dr. Foster testified placed him in the low average range, to 68 on the WAIS-III, which, according to Dr. Angelillo, would be indicative of mild mental retardation if "there were other . . . measures of adaptive functioning which also point in that direction." Notably, however, Dr. Angelillo did not classify the defendant as mentally retarded. More importantly, according to Dr. Foster, the results of the defendant's MMPI indicated a strong possibility that the defendant was "faking bad" or malingering, suggesting that his IQ scores might not be accurate.

Moreover, even if the defendant qualified as mentally retarded, that fact is but one of a number of different factors to be considered in the determination of whether the waiver of his Miranda rights was knowing and voluntary. In Blackstock, 19 S.W.3d at 208, our supreme court observed:

> Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] waive, the constitutional rights embraced in the Miranda rubric." Fairchild v. Lockhart, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989). Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.

Id. (footnote omitted).

The totality of the circumstances in this case, which included the defendant's extensive prior experience with the criminal justice system, relatively high IQ scores, and strong indication that he was malingering, supports the trial court's finding that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights. Accordingly, we conclude that the trial court did not err in denying the defendant's motion to suppress his statements.

### III. Failure To Instruct Jury on State's Duty to Preserve Evidence

As his final issue, the defendant contends that the trial court committed prejudicial error by not issuing Tennessee Pattern Jury Instruction 42.43, "Duty to Preserve Evidence," in response to the State's failure to preserve the tape recordings of the defendant's statements. The defendant acknowledges he failed to request the jury instruction at trial, but agues that the trial court should have nonetheless issued the instruction *sua sponte*. The State argues that, under the analysis of State

v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999), the loss of the audiotapes warranted neither a special jury instruction nor any other action on the part of the trial court. We, again, agree with the State.

In Ferguson, our supreme court adopted a balancing approach for courts to use to determine when the loss or destruction of evidence has deprived a defendant of his fundamental right to a fair trial. Id. at 917. Under this approach, the first step is to determine whether the State had a duty to preserve the evidence. As a general rule, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. (footnote omitted). If the proof shows that the State had a duty to preserve the evidence, and that the State failed in its duty, the court must then consider the following factors which bear upon the consequences of the State's breach of its duty: (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used to support the conviction. Id. If the court concludes, after consideration of all the factors, that a trial without the missing evidence would not be fundamentally fair, the court has the option of dismissing the charges against the defendant, issuing a special jury instruction on the significance of the missing evidence, or taking any other steps necessary to ensure a fair trial. Id.

The State does not dispute that it had a duty to preserve the tape recordings of the defendant's statements. It argues, however, that only minimal negligence was involved in the loss of the evidence, the missing evidence was not that significant in light of the fact the defendant's signed written statements were preserved, and there was overwhelming evidence to sustain the defendant's convictions. We agree.

At trial, Sergeant Davison testified that the audio recordings of the defendant's statements should have remained in the police department's property room until trial, at which point they would have been forwarded to the State property room for trial. However, the tapes were never forwarded to the State property room and when she investigated, she learned that an Officer Hutchinson, who had been assigned to their unit for ninety days, had taken the tapes, along with other evidence, to the Tennessee Bureau of Investigation ("TBI"). Sergeant Davison explained that by the time the TBI sent the evidence back to the property room, the police department had changed its method of recording evidence from the "Spillman System" to the "Vision System," but the evidence in the defendant's case, originally tagged under the Spillman System, was apparently never converted to the Vision System. Although she had searched for the tapes, she had been unable to find them. She further testified that the defendant's written statements contained an accurate and exact record of what the defendant said.

We agree with the State that there is no evidence that the State acted in bad faith or that there was anything but simple negligence involved in its loss of the evidence. We further agree that the loss of the tape recordings was not that significant in light of the written statements and that the evidence at trial overwhelmingly supported the defendant's convictions for first degree premeditated murder, first degree felony murder, and theft over $1000. Among other evidence presented at trial, the jury heard testimony from the victim's neighbor, Kristy Boddie, that she had heard loud stomping

-12-

in the early morning hours of Thursday, April 6, and had looked out the window to see the defendant carrying a television set from the victim's apartment to her vehicle and departing in the vehicle; testimony from Carlos Shaw about how the defendant had tried to sell him the vehicle without a title that morning and had offered to sell him a microwave, costume jewelry, and a computer; and testimony from the defendant's employer, Donald Newsom, that the victim had picked the defendant up from the restaurant on Wednesday evening and that the defendant had failed to show up for work the following evening. In addition, the jury had the defendant's April 10 statement, in which he stated that he must have killed the victim because there was no one else in the apartment at the time. Given the overwhelming evidence against the defendant, the loss of the audiotapes of his statements did not deprive him of his right to a fair trial. We conclude, therefore, that the trial court did not err by not instructing the jury on the State's duty to preserve evidence.

## CONCLUSION

Based on our review, we conclude that the trial court did not err in denying the defendant's motion in limine to present hearsay testimony, in denying the defendant's motion to suppress his statements, or in not instructing the jury on the State's duty to preserve evidence. Accordingly, we affirm the judgments of the trial court but remand for entry of a corrected judgment in Case No. 01-02751 to reflect the defendant's conviction offense which was omitted.

_____

ALAN E. GLENN, JUDGE